UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EDNA AGUILAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Case No.: 1:14-cv-1969-DML-TWP | |
| | ) | |
| MATHEW CARVER, and | ) | |
| CITY OF SEYMOUR | ) | |
| | ) | |
| Defendants. | ) | |

## Order on Defendants' Motion for Summary Judgment

This matter is before the court on a motion for summary judgment (Dkt. 29) filed by defendants Seymour Police Department Officer Mathew Carver and the City of Seymour.

### Undisputed Facts

Plaintiff Edna Aguilar is a Honduran citizen who has resided in the United States since October 2013 and obtained permanent residency in May 2014. Ms. Aguilar was stopped by Officer Carver on the night of June 12, 2014, for operating a vehicle without its headlights on, a traffic ordinance infraction under Indiana Code section 9-21-7-1. A video camera captured portions of the stop, and the following undisputed facts are established by that recording and other evidence submitted by the parties. Officer Carver gave Ms. Aguilar a verbal warning for the headlight infraction but did not issue a written citation for it. At the time of the stop, Ms. Aguilar was driving her husband's car while in possession of a Honduran driver's license and permanent residency card but no Indiana driver's license. After

obtaining those documents from her and performing some check of them, Officer Carver returned to Ms. Aguilar's car and directed her to step out of the car.  He then had her put her hands behind her back, handcuffed her, and told her she was going to jail.  During the course of this stop, she was placed in two different squad cars.  While Ms. Aguilar was handcuffed and in a police car, Officer Carver telephoned a deputy prosecutor regarding the situation.  After conferring with the deputy prosecutor, Officer Carver issued Ms. Aguilar a citation to appear in court under Indiana Code section 9-24-18-1 and did not take her to jail.  He also made arrangements to impound her vehicle.  Before the car was impounded, Officer Carver said, "You don't have anything illegal on you, do you?"  Ms. Aguilar responded, "No, you can check."  Officer Carver then proceeded to perform some search of the car.

Additional facts pertinent to the defendants' motion for summary judgment will be set forth below in the context of the court's analysis of the parties' arguments.

## Analysis

Ms. Aguilar's amended complaint alleges Fourth Amendment violations against Officer Carver based on the seizure of her person (arising from the stop) and property (arising from the search). (Dkt. 10 ¶¶ 33-34)   She also alleges that the City of Seymour is liable to her for false arrest and conversion under Indiana law and that the City has *respondeat superior* liability under Indiana law for the actions

of Officer Carver. (Dkt. 10 ¶¶ 35-37)[1]   Interestingly, the parties' summary judgment briefs do not match up directly to these claims.  They don't specifically address state law claims at all, and they argue a claim of *Monell* liability for failure to train that is not even mentioned in the amended complaint.  The plaintiff apparently concedes that her state law claims are dependent on her Fourth Amendment claims, because she has not briefed them separately.  And the defendants apparently concede that Ms. Aguilar's recitation in the amended complaint that she "reserves the right to proceed with any and all claims which the facts averred in this Complaint support" (Dkt. 10 ¶ 38) encompasses a *Monell* failure to train claim on which the defendants have moved for summary judgment. So the court will analyze the claims the parties have briefed.

The defendants filed a motion for summary judgment on all of Ms. Aguilar's claims.  They argue that the initial, lawful traffic stop did not develop into an unreasonable seizure because "there is no evidence that Officer Carver prolonged the traffic stop more than was necessary to investigate the potential crime of operating without a valid driver's license."  (Dkt. 30 at p. 9).  Beyond that, they maintain that, even if the stop is considered an arrest, there was probable cause for it.  Second, they contend that even if Ms. Aguilar's detention was not constitutional, Officer Carver is entitled to qualified immunity, primarily because the officer sought legal advice.  Next, the defendants assert that the warrantless search of Ms.

---

[1]   Ms. Aguilar does not contest the legality of the initial stop, as she admits that she had not activated her headlights.

Aguilar's car did not violate the Fourth Amendment because Ms. Aguilar consented to the search and, moreover, the search was justified by the "impound inventory exception" to the warrant requirement.  (Dkt. 30 at p. 13).  Finally, the defendants argue that there is no evidence of an official, unconstitutional municipal policy that would support a finding that the City is liable in this matter. The court addresses these arguments in turn below, after first discussing the defendants' threshold challenge to the admissibility of certain matters Ms. Aguilar has asserted in opposition to summary judgment.

## I.      The Defendants' Challenge to Ms. Aguilar's Statement of Facts

At the outset, the court addresses the defendants' request (in their reply to Ms. Aguilar's response) that much of Ms. Aguilar's "Statement of Material Facts and Facts in Dispute" in opposition to summary judgment be rejected because the statement contains "inadmissible hearsay, conclusory assertions, and legal opinions." (Dkt. 45 at p. 1).  Federal Rule of Civil Procedure 56(c) governs the procedures for supporting factual positions in support of or in opposition to a motion for summary judgment.  Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Additionally, this court's Local Rule 56.1 mandates that a non-movant in a summary judgment action include in her response "a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."

The defendants contend that the following paragraphs of Ms. Aguilar's "Statement of Material Facts and Facts in Dispute" contain inadmissible hearsay: 6, 8, 10-13, 15, and 20.  These paragraphs set forth information that Ms. Aguilar was allegedly told by the Honduran Office of Transportation, the Indiana BMV, and her insurance agent with regard to her ability to drive legally in Indiana on a Honduran driver's license, as well as information taken from the Indiana BMV's official webpage.  Whether they are hearsay depends on what the statements are offered to prove.  But what Ms. Aguilar was told or may have believed about the legality of driving in Indiana on a Honduran driver's license is largely irrelevant to the court's resolution of the defendants' motion for summary judgment; the court will therefore disregard these paragraphs for purposes of its analysis.

The defendants also argue that paragraphs 14, 15, 18, 19, 20, 36, 37, 41, 60, and 68 do "no more than assert legal opinions, recite legal authorities, or summarize what she claims state agencies 'require.'" (Dkt. 45 at p. 2).  Paragraph 14, for instance, contains a lengthy excerpt of the Geneva Convention on Road Traffic.  (Dkt. 41 at p. 4).  Paragraphs 15, 19, and 20 provide information on the Indiana BMV's procedures for obtaining a driver's license.  Paragraph 18 reads as follows:

> Not only do citizens of other countries who move to Indiana from their home countries enjoy the one-year driving privilege bestowed upon them by U.S. treaty law, but, as a practical matter, the lengthy and time consuming process to obtain a valid Indiana driver's license make it impossible for them to obtain an Indiana driver's license within sixty days.  Aguilar Aff. 14; Kirts Aff. 12.

(Dkt. 41 at p. 5).  The court notes that the first part of the above-quoted paragraph, which asserts what "citizens of other countries" enjoy, is not supported by the cited portions of the record.  Paragraph 36 simply recites the text of Indiana Code section 34-28-5-3.  Paragraph 37 states:  "For ordinance violations, officers have the discretion to either issue a verbal or written warning or issue a citation to appear in court for the violation.  Carver Depo. 20; Ind. Code 34-28-5-3."  The court agrees that these statements are more legal than factual, but that incorrect denomination does not mean the court must disregard them if those statements of the law are nonetheless relevant to the resolution of the issues before the court.

As to the other paragraphs challenged by the defendants, Paragraph 41 states:  "Ms. Aguilar produced her valid Honduran driver's license and her permanent residency card.  Aguilar Aff. 25." (Dkt. 41 at p. 8).  Because the defendants have not conceded the validity of Ms. Aguilar's Honduran license— referring to it with qualifying terms such as "what purported to be a Honduran driver's license" (Dkt. 30 at p. 3), or "what she claims is a license to drive issued by the Republic of Honduras" (Dkt. 45 at p. 2)—the claim that hers was a "valid Honduran license" is a potentially relevant fact.  Paragraph 60 states, "Mrs. Aguilar's license was an international driver's license, issued to her in Honduras. Aguilar Aff. 5-6." (Dkt. 41 at p. 11).  This, too, is a potentially relevant fact. Moreover, the defendants have not disputed these assertions, and the court assumes their truth for purposes of the motion.  And finally, in Paragraph 68, Ms. Aguilar asserts the following:  "Chief Abbott is the final policymaker for the City of

Seymour on the training received by Seymour police officers on this issue, and is the person responsible to decide if his officers need any additional training or provided clarification of the law they are about to enforce. Abbott Depo. 25-26." (Dkt. 41 at p. 12).  This statement is supported by the portion of the record cited and could ultimately be a relevant fact in this case.

The court therefore does not "reject" all the challenged portions of Ms. Aguilar's statement of facts.  Rather, it will consider her assertions only to the extent consistent with the foregoing analysis of them.  The court now turns to the substantive issues raised by the summary judgment motion.

## II.   **Unreasonable Seizure/False Arrest under the Fourth Amendment**

It is well established that the Fourth Amendment prohibits unreasonable searches and seizures.  *See, e.g.*, *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014). As the Second Circuit has recognized, two categories of seizures of the person implicating the protection of the Fourth Amendment have emerged in the caselaw. *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991).  The first is an "investigative detention" or *Terry* stop, which employs "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and is supportable by reasonable suspicion, rather than requiring probable cause.  *See id*. (*citing Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325 (1983) ("The scope of the detention must be carefully tailored to its underlying justification.")).  The Fourth Amendment allows officers to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by

articulable facts that criminal activity 'may be afoot.'" *United States v. Wilbourn*, 799 F.3d 900, 908-09 (7th Cir. 2015) (*citing United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry,* 392 U.S. at 21).   When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006).

But a traffic stop will be considered an arrest for Fourth Amendment purposes if it extends beyond the time reasonably necessary to complete the purpose for which the stop was made.  *Huff v. Reichert*, 744 F.3d 999, 1005 (7th Cir. 2014). Ms. Aguilar argues that this was indeed an arrest; the defendants maintain that it was a mere *Terry* stop.   Nonetheless, the defendants contend in their reply brief that even if Ms. Aguilar was placed in "full custodial arrest," the facts show that Officer Carver had probable cause to do so.  (*See* Dkt. 45 at p. 5).  To be deemed reasonable, a warrantless arrest made in public must be supported by probable cause.  *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) (*citing United States v. Watson*, 423 U.S. 411, 414-24 (1976)).  Probable cause to arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person's belief that the arrestee had committed, was committing, or was about to commit a crime.  *Id.*  The existence of probable cause is an absolute defense to a §1983 claim for false arrest.  *Id.* at 1007.

Here, Ms. Aguilar alleges in her amended complaint that the defendants falsely arrested her (and illegally seized her property).[2]  (Dkt. 10).  The defendants' initial memorandum in support of their motion for summary judgment frames the issue as a reasonable Fourth Amendment seizure (or reasonably prolonged traffic stop), rather than a false arrest.  (Dkt. 30 at p. 8).  But their reply brief argues that "even if it is as [Ms.] Aguilar contends and she was placed in full custodial arrest, the facts presented to Officer Carver gave him the constitutional authority to effectuate such an arrest."  (Dkt. 45 at p. 5).

The court does not need to decide, nor will it, whether Ms. Aguilar's detention was a *Terry* stop or an arrest and, if the latter, whether it was supported by probable cause.  As explained in section III below, the right of Ms. Aguilar to drive legally in Indiana on her Honduran driver's license is, at best for her, not clear.  Officer Carver therefore has qualified immunity on the false arrest claim.  And because, as explained in section V below, there is no evidence to support *Monell* liability of the city for the arrest based on failure to train, there is no need to address the claim further.

## III.   Qualified Immunity for Officer Carver

"Qualified immunity protects an officer from liability if a reasonable officer could have believed that the action taken was lawful, in light of clearly established law and the information the officer possessed at the time."  *Phillips v. Community*

---

[2]    As noted above, Ms. Aguilar does not contest the legality of the initial stop, as she admits that she had not activated her headlights.  (Dkt. 41 at p. 8, 16).

*Ins. Corp.*, 678 F.3d 513, 527-28 (7th Cir. 2012).  Thus, the court examines two questions: (1) whether a constitutionally protected right has been violated and (2) if so, whether the right was clearly established at the time of the violation.  *Alexander v. City of Milwaukee*, 474 F.3d 437, 444 (7th Cir. 2007).  An officer is entitled to qualified immunity where clearly established law does not show that his conduct violated the Fourth Amendment.  *Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009) (in which the Supreme Court held that in resolving government officials' qualified immunity claims, courts need not first determine whether facts alleged or shown by plaintiff constitute violation of a constitutional right).  This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.  *Id*. at 244 (internal quotation omitted).

The Seventh Circuit has also held that "a court can grant qualified immunity even when an official's conduct violated clearly established law (which he is presumed to know) under some circumstances when the official relied on legal advice in taking action."  *Finch v. City of Indianapolis*, 886 F.Supp.2d 945, 979 (S.D. Ind. 2012) (*citing Davis v. Zirkelbach*, 149 F.3d 614 (7th Cir. 1998)).  In general, advice of counsel does not give rise to a qualified immunity defense; but some circumstances can give rise to the extraordinary level, and the *Davis* court noted a number of objective factors that may tend to demonstrate that the reliance and advice are of the extraordinary type appropriate to insulate the official from liability.  *See Davis*, 149 F.3d at 620.  These factors include the following:

> Relevant factors include how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, whether complete information had been provided to the advising attorney(s), the prominence and competence of the attorney(s), and how soon after the advice was received the disputed action was taken.

*Id.* (*quoting V-1 Oil Co. v. Wyoming*, 902 F.2d 1482, 88-89 (10th Cir. 1990) (internal quotations, citations, and footnotes omitted).

### A. "Advice of Counsel" Qualified Immunity

The court will address the latter issue first: the defendants' argument that Officer Carver's telephone call to Deputy Prosecutor Tyler Banks for legal advice entitles him to qualified immunity. The court finds that Officer Carver is not entitled to qualified immunity under the advice-of-counsel exception. As discussed above, advice of counsel gives rise to a qualified immunity defense only in extraordinary circumstances, and they are not present here. To begin with, the defendants have provided very little information about the legal advice allegedly given to Officer Carver. In his deposition, Ms. Aguilar's attorney asked Officer Carver about his call to Deputy Prosecutor Tyler Banks, and the following colloquy occurred:

> [Officer Carver]: I called Deputy Prosecutor Banks.
> . . . . .
>
> [Ms. Aguilar's attorney]: What did you tell him?
>
> A: Basically I explained to him the traffic stop in itself, reason why I pulled them over, the things I that had acquired during the traffic stop is what I explained to him.
> . . . . .
>
> Q: Okay. You say you advised Deputy Prosecutor Banks that you had stopped her for the headlight violation; correct?

A:  That is correct.

Q:  And that she had a document that she said was a valid Honduran license; correct?

A:  Yes, that she advised that, yes.

Q:  And did you advise him whether you had determined whether that's a valid license or not?

A:  No.  There's no way for me to determine that.
. . . . .

Q:  And why did you call Tyler Banks?

A:  Basically the reason why I called him is because I wanted to, number one, give her the benefit of the doubt.  I wanted to make sure that I did everything possible, that I made the right call[.] . . .  She was pretty adamant that she was able to drive, and she had said that her husband told her she could drive and that the insurance company had told her she could drive.  I wanted to make sure I was doing the right thing.
. . . . .

Q:  . . . Did you tell Tyler Banks that you were going to have her taken to jail?

A:  That was the whole basis of me calling him is to get his determination on what he thought would be the best setup for this deal.

Q:  Did he advise you on what the law was in driving on a foreign national license in the United States?

A:  He did not.

Q:  Did he express that the law is somewhat confused in that area and he wasn't sure whether that was illegal or not?

A:  All he advised me that based on what I advised that the best option would be to cite her in to court.

Q:  The best option rather than take her to jail?

A:  There were only two alternatives at that point.  He advised me that he couldn't tell me.  You know, you can never just say do this or do that, you know, but he said your best option given the situation would be cite her in to court.

Q:  So he didn't tell you, hey, what you've told me that she's done an illegal act.  Go ahead and arrest her; correct?

A:  He didn't advise me not to.  He just advised that your better option would be to cite her in to court.
. . . . .

Q:  . . . He didn't advise you any more on the law than what you already knew; correct?

A:  No.
. . . . .

Q:  And you're not testifying that Tyler Banks told you to go ahead and cite her in to court, that he instructed you to do that; correct?

A:  He advised me that that would be the best option.

Q:  The better option of the two that you presented him of taking her to jail or citing her in to court?

A:  I laid out the facts to him, and he told me that my better option in that sense would be to cite her in to court.  That's what he told me.

Q:  Rather than arrest her?

A:  That's correct.

(Dkt. 31-3 at p. 18-28.)

Thus it appears that Deputy Prosecutor Tyler Banks, who was not himself deposed, avoided entirely the question of the legality of Ms. Aguilar's driving on a Honduran driver's license and instead limited his "advice" to telling Officer Carver to cite her in to court rather than arrest her.  Given the factors identified by the

*Davis* court—including "how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was"—Deputy Prosecutor Banks's advice was clearly not "of the extraordinary type appropriate to insulate the official from liability." *Davis*, 149 F.2d at 620. To qualify for this exception, it is not enough simply to assert that an attorney was consulted; without a showing that the advice the attorney provided was reasonably unequivocal and specific to the facts and was provided by a demonstrably competent attorney, the court cannot say that this warrants the "advice of counsel" protection of qualified immunity for Officer Carver.

### B. General Qualified Immunity

The court now turns to the question of whether qualified immunity is nonetheless warranted because clearly established law does not show that Officer Carver's conduct violated the Fourth Amendment. *Pearson*, 555 U.S. at 243-44. This inquiry turns on the objective legal reasonableness of the action, *assessed in light of the legal rules that were clearly established at the time it was taken. Id.* at 244 (emphasis added, internal quotation omitted).

As a preliminary matter, Ms. Aguilar contends in her surreply brief that the defendants have waived any qualified immunity arguments other than the "advice of counsel" approach. First, although it is true that the defendants initially argued that Officer Carver was entitled to qualified immunity because he had sought the advice of legal counsel, it cannot be said that they completely failed to raise the qualified immunity argument in their initial memorandum or raised it for the first

time in their reply brief.  *See, e.g.*, *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("While arguments made for the first time in a reply brief are generally treated as waived, it does not necessarily follow that arguments that are better developed in a reply brief are waived.").  Moreover, the rationale generally cited for prohibiting new arguments in the reply brief is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument.  *See id*.  But here, Ms. Aguilar *had* an opportunity to respond to the defendants' argument in her surreply brief and chose instead to argue waiver alone.  Accordingly, the court does not find that the defendants waived their argument that Officer Carver is entitled to qualified immunity because of the lack of clearly established law governing Ms. Aguilar's right to drive in Indiana with a Honduran driver's license.

The court now turns to the matter of "clearly established law," that is, the law governing Ms. Aguilar's driving in Indiana with a (presumably valid) Honduran license.[3]  The parties have not pointed to any Indiana state statute that covers a person in Ms. Aguilar's situation.  Indiana Code section 9-24-1-1 states that, except as provided in Section 9-24-1-7 (discussed below), an individual must have a valid driver's license or permit issued to the individual by the bureau to operate upon the highway the type of motor vehicle for which the driver's license or permit was

---

[3]     In her affidavit, Ms. Aguilar states that her Honduran driver's license was issued on July 25, 2013.  (Dkt. 41-1 at p. 1).

issued.  Indiana Code section 9-24-1-7 ("Exempt persons") provides in relevant part

as follows:

> (a) Section 1 of this chapter does not apply to the following individuals:
> . . .
>> (3) a *nonresident* who:
>>
>>> (A) is:
>>>> (i) at least sixteen (16) years old and one hundred eighty (180) days of age; or
>>>>
>>>> (ii) employed in Indiana;
>>>
>>> (B) has in the nonresident's immediate possession a valid driver's license that was issued to the nonresident in the nonresident's home state or country; and
>>>
>>> (C) is lawfully admitted into the United States[.] . . .
>>
>> (4) A new Indiana resident who:
>>
>>> (A) possesses a valid driver's license issued by the state or country of the individual's former residence; and
>>>
>>> (B) is lawfully admitted in the United States;
>>
>> *for a period of sixty (60) days after becoming an Indiana resident*[.]
>> . . .

(emphasis added).  And, finally, Indiana Code section 9-24-18-1 ("Driving without a

license") provides that except for an individual exempted under Indiana Code

section 9-24-1-7 (discussed above), an individual who knowingly or intentionally

operates a motor vehicle upon a highway and has never received a valid driver's

license commits a Class C misdemeanor.[4]

---

[4]     Driving without a license is a Class A misdemeanor if the individual has a prior unrelated conviction.

16

Ms. Aguilar moved from Honduras to Indiana in October 2013, applied for permanent residency status on January 1, 2014, and obtained her permanent residency card on May 31, 2014.  The stop at issue in this case occurred on June 12, 2014.  At the time of the stop she therefore had been an Indiana resident for considerably longer than sixty days, which means she didn't qualify for either of the two categories of "exempt persons" discussed above.  *See* Ind. Code § 9-24-1-7; *cf. United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (plaintiff was not a Tennessee resident but was just passing through the state, and a Tennessee state statute provided that "a resident of any state or country may operate a motor vehicle in Tennessee with a valid license issued by the person's home state or country").

Ms. Aguilar nonetheless maintains that she could drive legally in Indiana for up to a year with just her Honduran driver's license, and her asserted basis for that right is two separate international treaties: the Convention on Road Traffic (Geneva, 1949) and the Convention on the Regulation of Inter-American Automotive Traffic (Washington, 1943).  In her initial response to the defendants' summary judgment motion, Ms. Aguilar cites numerous cases that discuss these "federal treaty rights."  (Dkt. 41 at p. 18) (*citing, e.g., United States v. Reyes-Gomez*, 2013 WL 4776461 (E.D. Kentucky Sept. 4, 2013) ("The court notes that non United States citizens may drive in the United States on their valid foreign license and an International Permit for up to one year from the date of admission into the United States, so long as the individual's home country is part of the Geneva Compact.");

*Urrietta*, 520 F.3d 569 (because a Tennessee state statute provided that a resident of any state or country may operate a motor vehicle in Tennessee with a valid license issued by the person's home state or country, government withdrew the argument that person's extended detention was justified because his Mexican license was invalid).

The problem with the plaintiff's approach, however—as the defendants argue in their reply brief—is that it is not at all clear that these treaties actually apply in this case or confer the rights on which Ms. Aguilar bases her claims.  To begin with, the defendants argue that Ms. Aguilar's home country of Honduras is not actually a party to the 1949 Convention on Road Traffic, which renders that treaty wholly inapplicable in this case.  (*See* Dkt. 45 at p. 11).[5]  Next, the defendants contend that the other treaty cited by Ms. Aguilar, the Convention on the Regulation of Inter-

---

[5]     The Convention begins with a Proclamation, which states in relevant part as follows:

> WHEREAS the said Convention was signed during that period by the respective plenipotentiaries of the United States of America, Austria, Belgium, Czechoslovakia, Denmark, the Dominican Republic, Egypt, France, India, Israel, Italy, Lebanon, Luxembourg, the Netherlands, Norway, the Philippines, Sweden, Switzerland, the Union of South Africa, the United Kingdom of Great Britain and Northern Ireland, and Yugoslavia, and the said related protocol was signed during that same period by the respective plenipotentiaries of the United States of America, Belgium, Denmark, the Dominican Republic, Egypt, France, India, Italy, Lebanon, Luxembourg, the Netherlands, Norway, the Philippines, Sweden, Switzerland, the Union of South Africa, and the United Kingdom of Great Britain and Northern Ireland[.]

Convention on Road Traffic, T.I.A.S. No. 2487, 3 U.S.T. 3008, 1952 WL 44658.

American Automotive Traffic, also does not clearly extend the expansive privileges she suggests.  They maintain that a treaty does not have "effect as domestic law" unless and until "Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be self-executing and is ratified on these terms," *citing Medellin v. Texas*, 552 U.S. 491, 505 (2008) (internal quotation omitted). (Dkt. 45 at p. 12).  They further point out that Ms. Aguilar has not directed the court to any authority that would make the Convention on Inter-American Traffic applicable here.

Ms. Aguilar did not respond substantively to these arguments in her surreply brief.  Rather, she says that the defendants have waived these arguments by relying "exclusively" on the advice-of-counsel position to support their qualified immunity defense.   (Dkt. 46 at p. 4).  The court has rejected this waiver argument, for the reasons explained above.  Ten days after filing her surreply, Ms. Aguilar did file a Submission of Supplemental Relevant Authority, attaching two items: the text of the 1943 Convention on the Regulation of Inter-American Automotive Traffic and an Opinion of the Michigan Attorney General discussing the legality of a resident of Mexico who possesses a valid Mexican driver's license operating a vehicle within the state of Michigan. (Dkt. 47-2).  The significance of these items for purposes of qualified immunity is not readily apparent.

What is demonstrated by this discussion is that Ms. Aguilar's right to drive on her Honduran license under these circumstances was far from being clearly established.  No Indiana law, no United States Supreme Court decision, no Seventh

Circuit Court of Appeals decision, no federal statute established this right.  This court cannot say—even with the benefit of all the parties' arguments and citations—that Ms. Aguilar had that right.  Officer Carver is therefore entitled to qualified immunity on the traffic stop claim.

## IV.   Constitutionality of Vehicle Search

The court next addresses the constitutionality of the search of Ms. Aguilar's car.  The defendants argue that Ms. Aguilar consented to the search and, furthermore, that the search was justified by the "impound inventory exception to the warrant requirement."  (Dkt. 30 at p. 13).  With regard to the consent issue, the Seventh Circuit has said that the key consideration in evaluating whether a warrantless search premised on consent was valid is whether "the consent was freely and voluntarily given—a factual question to be determined by the totality of the circumstances."  *Huff v. Reichert*, 744 F.3d 999, 1008 (7th Cir. 2014) (*quoting McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1178 (7th Cir. 1993).  And as to the defendants' claim that, before having the vehicle impounded, Officer Carver performed an inventory search—a "recognized exception to the warrant and probable-cause requirements of the Fourth Amendment[,]" *U.S. v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (*citing United States v. Wilson,* 938 F.2d 785, 788 (7th Cir. 1991))—the Seventh Circuit provides the following guidance:

> Searches conducted by the police prior to towing a car are "lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property."

*Cherry*, 436 F.3d at 772 (*citing United States v. Pittman,* 411 F.3d 813, 817 (7th Cir.

2005)).

As the factual basis underlying these arguments, the defendants assert in

their summary judgment brief:

> Aguilar was detained in handcuffs while Carver attempted to determine
> the proper course of action.  (Deposition of Mathew Carver, p. 22). . . .
> Upon determining that the vehicle would be towed, Carver performed
> an inventory of the vehicle.  (Deposition of Mathew Carver, p. 39)[6]. . . .
> When Carver questioned Plaintiff as to whether she was in possession
> of anything illegal, she offered him the opportunity to check for himself.
> (Deposition of Edna Aguilar, p. 32; Videotape of incident, 04:53.)[.][7]

---

6      The excerpt from Officer Carver's deposition cited in support of this
statement reads as follows:

> [Ms. Aguilar's attorney]:  Did you search her?
> [Officer Carver]: I did not.
> . . . . .
> Q:  And did you search her car?
> A:  I did.  Sorry.  Can I recant that?
> Q:  Sure.
> A:  I performed a vehicle inventory of her car.
> Q:  When was that?
> A:  That would have been – it would have been prior to the tow truck
> getting there.
> Q:  Did you also open the trunk and look in the trunk?
> A:  You know, I'm not sure on that.  I have to review my video for that.
> I'm not sure if I opened the trunk or not, sir.

(Dkt. 31-3 at p. 11).

7      In her deposition, Ms. Aguilar recounted the event as follows:

> Q: . . . Do you remember either Officer Carver or one of the other
> officers asking you whether you had anything in your car?
> [Ms. Aguilar]:  Yes.
> Q:  And what was your answer?
> A:  No, I don't have anything.
> Q:  Do you know who asked you that?

[footnote continued on next page]

21

(Dkt. 30 at p. 4).

In her reply, Ms. Aguilar contends that her consent was not freely and voluntarily given, as she was illegally detained and in handcuffs when Officer Carver asked, "You don't have anything illegal on you, do you?" (*See* Dkt. 41 at p. 23, *citing Florida v. Royer*, 460 U.S. 491, 497 (1983) ("First, it is unquestioned that without a warrant to search Royer's luggage and in the absence of probable cause and exigent circumstances, the validity of the search depended on Royer's purported consent. Neither is it disputed that where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.")). And the evidence that Officer Carver's question to Ms. Aguilar was whether she had anything illegal "on [her]" raises an ambiguity about the scope of her consent: did she consent to a search of her person or of her car?

Ms. Aguilar argues further that Officer Carver did not follow standardized inventory procedures when he searched the car and thus is not entitled to rely on the inventory search exception to warrant and probable cause requirements. "[He]

---

A:  He ask me, the Officer Carver.
. . . . .
Q:  And did you tell them they could search the car if they wanted?
A:  What I said is I don't have anything.  You can look.
Q:  And did they look in your car? Do you know?
A:  Yes.

(Dkt. 31-1 at p. 8).

did not write anything down.  He was not methodical in his search.  He rummaged through Mrs. Aguilar['s] car after asking her if she had anything 'illegal' on her.  Facts 88, 89."  (Dkt. 41 at p. 25.)  The alleged inventory search was, according to Ms. Aguilar, "a pretext for investigating criminal activity in violation of Mrs. Aguilar's Fourth Amendment rights."  (Dkt. 41 at p. 25.)  The defendants offer no substantive response to these arguments.  They have not presented evidence of a standard police procedure for such searches nor evidence that Officer Carver followed that procedure.

The court finds that the defendants have not established their entitlement to judgment as a matter of law on either the consent or the inventory search issues.  There is a genuine factual dispute as to whether Ms. Aguilar freely and voluntarily consented to a search of her car.  And there are insufficient facts on which the court could determine as a matter of law that Officer Carver's search was permissible as an inventory search.  The court therefore denies summary judgment on Ms. Aguilar's Fourth Amendment claim based on the search of her car.

## V.     Municipality Liability

Finally, the court addresses the question of the City of Seymour's liability.  A local government may not be sued under §1983 for an injury inflicted solely by its employees or agents.  *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is

responsible under §1983." *Id.* In other words, *respondeat superior* or vicarious liability will not attach under §1983. *See City of Canton, Ohio v. Harris*, 498 U.S. 378, 385 (1989). A local governmental unit's unconstitutional policy or custom can be shown by: (1) an express policy causing the loss when enforced; (2) a widespread practice constituting a "custom or usage" causing the loss; or (3) a person with final policymaking authority causing the loss. *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). In *City of Canton,* the Supreme Court held that "the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 498 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under §1983." *Id.* at 389. "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391.

In their summary judgment motion, the defendants argue that Ms. Aguilar cannot prove the existence of an unconstitutional policy, practice, custom, or procedure, or that Officer Carver was "unconstitutionally undertrained." (*See* Dkt. 30 at p. 15). Ms. Aguilar argues in response that the evidence "demonstrates a manifest need for training on the exact issue for which Mrs. Aguilar was unconstitutionally arrested" because Seymour police officers regularly come into contact with drivers who have licenses issued by their home countries. (Dkt. 41 at pp. 26-27). In support of her contention that "[t]he situation of foreign nationals

driving on their home country driver's licenses regularly arises during Officer

Carver's enforcement of traffic laws," Ms. Aguilar cites the deposition testimony of

Officer Carver and Officer Schrapson.[8]  Officer Carver testified:

> [Ms. Aguilar's attorney]:   [T]he issue of the validity of a foreign
> national's driver's license that's issued in another country comes up
> quite a bit, doesn't it, in police work?
>
> [Officer Carver]:  This is the first time I've had something like this come
> up.
>
> Q:  First time you've had a Honduran license come up, but you told me
> you've had a number of people on Mexican licenses; correct?
> . . . . .
> A:  Yes.  I have seen a number of them, yes.
>
> Q:  And you don't know whether those are valid or not because they're
> in Spanish for the most part?

---

[8]      Elsewhere in the "Statement of Material Facts and Facts in Dispute," Ms.
Aguilar cites an excerpt from Chief Abbott's deposition in support of the following
"fact":  "Seymour police officers regularly stop Mexican nationals for alleged driving
offenses, who are driving in Indiana on foreign licenses.  Abbott Depo. 12; Schapson
Depo. 20."  This excerpt reads as follows:

> [Ms. Aguilar's attorney]:  Does the issue of foreign nationals driving on
> foreign licenses come up in Jackson County, Indiana?
> [Chief Abbot]:  Sometimes.
> Q:  There are a number of Mexican nationals that live here?
> A:  There's several different nationalities.
> Q:  And your officers on a somewhat regular basis perhaps stop foreign
> nationals who are driving on foreign licenses?
> A:  Just in the course of a traffic stop, yes.
> Q:   And they would need to know, would they not, whether those are
> valid license[s] or not?
> A:  Correct.

(Dkt. 41-5 at p. 7).

A:  Well, there's no way to validate to see if that's valid.  You can't run that through IDACS.[9]

Q:  So but with respect to whether the person has been here 60 days or eight months and they have a foreign license, you don't know whether that makes it legal for them to drive under international laws the United States has signed treaties to, do you?

A:  I don't know anything about the treaties or what you just said, the international.  I haven't been informed of that.  I'm sorry.

Q:  But the issue of you stopping people with foreign licenses, that circumstance arises regularly in police work, doesn't it?

A:  It could.

Q:  It does in Seymour, doesn't it?

A:  It has.

(Dkt. 41-3 at p. 18-19).

Officer Schapson testified:

[Ms. Aguilar's attorney]: . . . I assume that the issue of foreign nationals driving on foreign licenses comes up in police work in Seymour?

[Officer Schapson]:  Correct.

Q:  With some regularity?

A:  Correct.

(Dkt. 41-4 at p. 7).

---

9       IDACS stands for Indiana Data and Communications System, a "computerized law enforcement/criminal justice communications and information storage and retrieval system. [. . .] designed to serve as a tool in providing more effective and efficient law enforcement for both the citizens of this State and, through interfacing with the National Crime Information Center (NCIC) computer, and the International Justice and Public Safety Network (NIets) computer, the Nation as a whole."  https://secure.in.gov/idacs/ (last accessed 08/03/2016).

The testimony noted above identifies a threshold challenge officers encounter in these circumstances:   that there is no way of confirming the validity of a foreign license because that information is not available in the Indiana Data and Communications System.  But more important for summary judgment purposes, Ms. Aguilar has not provided the proof necessary to meet the high "deliberate indifference" standard set forth in *City of Canton*.  Testimony by two Seymour police officers that they have previously encountered "foreign nationals driving on foreign licenses" (Dkt. 41-5 at p. 7) is a far cry from evidence that their training is constitutionally deficient or indicative of deliberate indifference to the constitutional rights of these drivers.  Ms. Aguilar has provided no specific evidence about prior stops, and the court has no way to know whether those other stops presented similar issues or whether those drivers even suffered constitutional violations causally connected to the City of Seymour's alleged failure to train its police officers.

In his *City of Canton* concurrence, Justice Brennan wrote: "Where, as here, a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution."  489 U.S. at 394-95 (Brennan, J., concurring); *see also Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997) ("The [plaintiff] did not show a pattern of constitutional violations constituting notice that a training deficiency existed. Without a showing of such deficiencies along with an awareness of them by the Village government, there is insufficient evidence on which to ground

municipal liability.").  Ms. Aguilar has not presented sufficient evidence to support the finding of a pattern of constitutional violations constituting notice of a training deficiency or that the City was otherwise deliberately indifferent.  Accordingly, the court grants summary judgment in favor of the City of Seymour.

## Conclusion

For the foregoing reasons, the court GRANTS summary judgment in favor of defendant Mathew Carver on Ms. Aguilar's claim arising from the traffic stop and DENIES summary judgment on her claims against Mathew Carver arising from the search of her car.  The court GRANTS summary judgment in favor of the City of Seymour on all claims against it.

So ORDERED.

Dated:  September 30, 2016

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system

28